699 So.2d 403 (1997)
Rick A. JENSON
v.
FIRST GUARANTY BANK, et al.
Rick A. JENSON, et al.
v.
FIRST GUARANTY BANK, et al.
Nos. 96 CA 0381, 96 CA 0382.
Court of Appeal of Louisiana, First Circuit.
May 9, 1997.
Rehearing Denied October 8, 1997.
*404 Clayton J. Swank, III, Covington, and Frank V. LeBlanc, III, Metairie, for Plaintiffs-Appellants Rick A. Jenson, et al.
Jack M. Weiss, Paul J. Masinter and Daniel Lund, New Orleans, for Defendants-Appellees First Guaranty Bank, et al.
Before WHIPPLE and FITZSIMMONS, JJ., and TYSON[1], J. Pro Tem.
FITZSIMMONS, Judge.
Plaintiffs, Rick A. Jenson and Scott Crabtree d/b/a/ Pangaea, Inc., Pangaea Corporation, Pangaea Partnership, or the Pangaea Entities (Pangaea), allege that defendant, First Guaranty Bank (the Bank)[2], contracted with plaintiffs, as an independent business, for the recapitalization of the Bank. At the time of the alleged contract, Mr. Jenson was President and a director of the Bank, and Mr. Crabtree was a consultant hired by the Bank. The defendants asserted that no such contract existed, and that the recapitalization plan was a Bank marketing plan, formulated while Mr. Jenson and Mr. Crabtree were employees, to attract new investors. Defendants filed answers, and a reconventional demand. On May 22, 1995, all of the remaining defendants filed motions for summary judgment. The trial court found that no genuine issue of material fact remained, and that no contract existed. The trial court granted summary judgments in favor of the defendants, and dismissed the plaintiffs' suit.[3] Plaintiffs appealed.[4]
On appeal, summary judgments are reviewed de novo. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 26 (La.7/5/94); 639 So.2d 730, 750. A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B. Once the mover makes a prima facie showing that there is no genuine issue as to material fact, and that summary judgment should be granted, the burden shifts to the opposing party. The opposing party cannot rest on "mere allegations or denials of his pleading, but ... must *405 set forth specific facts" that a genuine issue of material fact remains. La. C.C.P. art. 967.
A genuine issue of fact is an issue on which reasonable minds could disagree. If "reasonable persons could reach only one conclusion" based on "the state of the evidence," a genuine issue does not remain. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 at p. 27; 639 So.2d at 751; see also Hayes v. Autin, 96-287, p. 5 (La.App. 3d Cir. 12/26/96); 685 So.2d 691, 694, writ denied, 97-0281 (La.3/14/97); 690 So.2d 41. "A fact is material when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery." Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 at p. 27; 639 So.2d at 751.
Before the amendment of Louisiana Code of Civil Procedure article 966 by Acts 1996, First Extraordinary Session, No. 9, the moving party's documentation supporting the motion was more closely scrutinized than the opposing party's. When in doubt, the grant of summary judgments was not favored. However, the former jurisprudential presumption against summary judgments has been legislatively overruled by the amendment. The procedure is now favored. La. C.C.P. art. 966 A(2); Colver v. Travelers Insurance Companies, 95-1696, p. 6 (La. App. 1st Cir. 11/8/96); 685 So.2d 179, 183, writ denied, 96-2928 (La.2/21/97); 688 So.2d 516. The legislative changes to Code of Civil Procedure article 966 bring the article more into line with its federal counterpart, Federal Rule of Civil Procedure 56. Hayes, 96-287 at p. 7, 685 So.2d at 694.
"In effect, the amendment `levels the playing field' between the parties in two ways: first, the supporting documentation submitted by the parties should be scrutinized equally, and second, the overriding presumption in favor of trial on the merits is removed." Hayes, 96-287 at p. 6, 685 So.2d at 694. If, "[a]fter adequate discovery," an opposing party, who bears the burden of proof at trial, "fails to make a showing sufficient to establish the existence of proof of an element essential to his claim," a summary judgment is mandated by revised Code of Civil Procedure article 966. La. C.C.P. art. 966 C; see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Hayes, 96-287 at p. 7, 685 So.2d at 695.
On December 18, 1992, Mr. Jenson was terminated from his employment with the Bank. Scott Crabtree, also no longer a Bank employee, sent a demand letter on Pangaea letterhead to the Bank on January 6, 1993. In the letter, Mr. Crabtree demanded that the Bank comply with the terms of the agreement between Pangaea and the Bank, including the right to purchase 80% of the Bank. He asserted that the agreement was approved by the Bank on August 8, 1991 and reported to the F.D.I.C. on August 12, 1991. The Pangaea plan encompassed marketing the plan to attract investor capital, the formation of a holding company, Pangaea Corporation, and transfer of 80% of the Bank's stock to the holding company. Suit by the plaintiffs followed.
As evidence of an actual contract, plaintiffs rely primarily on the minutes of the August 8, 1991 Bank's Board of Directors meeting. Plaintiffs allege that the Pangaea "Black Book," containing the complete Pangaea Plan, and a draft of the shorter summary document, the Capital Enhancement Plan (CEP), were presented at the Bank's Board of Directors meeting on August 8, 1991. After the presentation, the board allegedly voted to contract with Mr. Jenson, Mr. Crabtree, or Pangaea, for implementation of the Pangaea Plan. The pertinent language is, as follows:
At this time an executive session was called during which time President Jenson discussed Management's plans for the enhancement of the capital of the Bank. The Board of Director's unanimously approved Management's capital plans and directed Management to communicate such plans to the F.D.I.C. and the Louisiana Office of Financial Institutions.
The minutes contain no reference to Pangaea or the distribution of Pangaea documents.
From our review of board minutes, including the meeting of August 8, as well as meetings before and after, we find that the term "Management" was used repetitively, and unmistakably, in board and executive session minutes to refer to the Bank. Hence, *406 the August 8 highlighted minutes provide no support for a contract between two independent parties.
A review of the Pangaea Book and CEP revealed no contract language between the Bank and Mr. Jenson, Mr. Crabtree, or Pangaea. The Pangaea Book was formatted as an informational sales document, not a contract. The title of the CEP is "First Guaranty Bank Capital Enhancement Plan." The only reference to approval by the Bank was a restatement of the August 8 meeting language: "The First Guaranty Bank Board of Directors, at its regularly scheduled meeting on August 8, 1991, approved management's plan to enhance and augment the Bank's capital." The sole named entity in the statement is the Bank. In the next few paragraphs of the CEP, the plan was summarized. The first summary paragraph begins: "First Guaranty Bank plans to form a holding company, Pangaea Corporation (Pangaea), which will raise $16,000,000." The language in these documents, asserted by plaintiffs as proof of the alleged contract, do not evidence a contract between two independent parties.
Plaintiffs also argued that the physical distribution of the Pangaea Black Book and the CEP at the August 8 meeting served as an offer to contract by Pangaea. After approval of the plan, the Pangaea Black Book and the CEP became the approved contract. Mr. Jenson and Mr. Crabtree testified that the items were presented at the meeting on August 8. Plaintiffs asserted that a package, with the documents, was sent out to a potential investor by Federal Express on August 12, 1991.
In response, defendants submitted proof, including evidence from the printer and graphic artist, that these items were not created or printed until after the August 8, 1991 meeting. Additionally, Pangaea, under any of its names, was not actually incorporated until February 21, 1992, as Pangaea, Inc.[5]
The trial court found that no genuine issue remained as to whether the Pangaea Book and CEP had been printed by August 8, 1991. We agree. The Federal Express receipt does not prove that the CEP existed on August 8, 1991. In view of the quality of the documentary evidence submitted by defendants, the allegations and denials by Mr. Jenson and Mr. Crabtree were not sufficient to present a genuine issue of material fact. Reasonable minds could have only concluded that the Pangaea Book and CEP did not exist on August 8, 1991, and therefore, could not have been presented at a meeting on that day.
Even if we assume that preliminary documents were distributed, the presentation of these documents does not evidence the alleged contract. The presentation of documents alleged by plaintiffs does not change the wording of the minutes, or the documents that we have already reviewed; nor, does it equate to offer and acceptance.
The August 8, 1991 minutes noted that President Jenson was directed by the Bank to communicate the recapitalization plan approved by the Bank to the banking regulatory agencies, the F.D.I.C. and the Louisiana Office of Financial Institutions. The August 12, 1991 letter, from President Jenson to the regulatory agencies, was written on Bank letterhead that identified Mr. Jenson as President and CEO of the Bank. Neither Pangaea, nor any third party, was mentioned in the letter. In the letter, Mr. Jenson used the term "we," which in context could only refer to the Bank. Mr. Jenson notified the regulatory agencies that "we," the Bank, had "finalized" plans for increasing the Bank's capital. He enclosed a copy of the CEP. The CEP attached to the August 12, 1991 letter contains the previously quoted language connecting the plan to the Bank alone. In one of the last paragraphs of the letter, Mr. Jenson stated: "In conclusion, we respectfully request that we be allowed sufficient time to implement our Capital Enhancement Plan and to continue to exhibit the resilience of this institution, from a financial performance and asset quality perspective, as well as in its ongoing ability to provide much-needed financial services and competition within our *407 trade area." This description, and the previously quoted material from the CEP, references the Bank. It does not reference Mr. Jenson, Mr. Crabtree, or Pangaea, which was not yet in existence. The language does not indicate a contract with an outside entity for implementation of the Pangaea plan.
At the August 26, 1991 executive committee meeting, as part of a "Capital Update, each committee member received a copy of the Pangaea package...." It was reported that "[i]nitial discussions were held with the FDIC regarding the possibility of this venture." (emphasis added.) At a board of director's meeting on September 11, 1991, a "general discussion was conducted regarding... current ongoing capital enhancement efforts."
During an executive committee session, convened after the board meeting on September 17, 1992, President Jenson discussed the "concept of capitalizing a holding company, namely Pangaea, whereby directors, existing shareholders and other interested parties as a group take part in recapitalizing the Bank." That plan was different from the original plan, where capital was sought mainly from outside investors. At the same session, another plan for recapitalization by an outside party, the Reynolds plan, was discussed. The executive committee appointed a committee to review the various proposals for recapitalization presented. President Jenson was made a member of the review committee ex-officio. In the minutes, President Jenson made no objection to the other proposal or any attempt to remind the Bank board of the alleged August 8, 1991 exclusive contract with plaintiffs.
At the September 22, 1992 Bank board meeting, a copy of the "Pangaea brochure," the August 8, 1991 minutes approving management's plan, and the August 12, 1991 letter to the F.D.I.C. and the Office of Financial Institutions were passed out. However, President Jenson did not state or infer that the Pangaea brochure, August 8 minutes, or the letter evidenced a pre-existing contract. At the same meeting, President Jenson asked one of the directors, Mr. Josh Cox, to "obtain a letter of interest from Mr. [Marshall] Reynolds relative to his intentions." The meeting ended with the approval for a hired consultant to evaluate all of the "transactions for increasing capital." The minutes show that the Pangaea plan and other proposals were being considered, but none had been chosen as an exclusive plan.
At the October 26, 1992 board meeting, more than one proposal for recapitalization was still being considered. After a discussion of the implementation of the Reynolds plan at the board meeting on December 10, 1992, President Jenson, who was involved in the Reynolds negotiations, voiced opposition to parts of the Reynolds plan. President Jenson did not assert that an obstruction existed, such as a prior contract with another party. On December 30, 1992, the executive committee authorized the Reynolds Stock Purchase Agreement. The stock was acquired by the Reynolds group in February of 1993.
Our review of the complete record failed to unearth any negotiations or drafting sessions for the alleged contract. No mention of a contract offer, presentation, or approval of a contract with plaintiffs appeared on the agenda for the August 8 meeting. The shareholders were not notified in the Bank's Annual Report for 1991 of a contract between plaintiffs and the Bank for recapitalization. The only recapitalization mentioned was presented as a plan by the Bank. The report was signed by Mr. Jenson, as President of the Bank. The banking regulatory agencies were not notified of any specific contract between the Bank and Mr. Jenson, Mr. Crabtree, or Pangaea, or of a change of control of the Bank to the plaintiffs.
We have reviewed the entire record, including the exhibits submitted by plaintiffs and defendants. Plaintiffs alone submitted over 150 exhibits. Our review of the record unearthed no tangible, written, signed contract, between the Bank and Mr. Jenson, Mr. Crabtree, or any of the Pangaea reincarnations. There is no contract that named the parties and delineated obligations or conditions of the contract. Even the most relevant documents, discussed above, do not evidence the alleged contract between the Bank and the plaintiffs, much less a contract for the change of control of a bank. See La. R.S. *408 10:8-319 (in effect until January 1, 1996). Neither does the record provide any support for an agreement by the Bank to contract with Mr. Jenson, Mr. Crabtree, or Pangaea.
For these reasons, we find no genuine issue of material fact remained, and the motions for summary judgments were properly granted. Plaintiffs, who carried the burden of proof on the contract, failed to submit sufficient evidence to establish an essential element to their case, the existence of any contract or even an agreement to contract. Without such evidence, all of plaintiffs' claims in suit number 9302674 fall. We affirm the summary judgments of the trial court in suit number 9302674(96 CA 0382). We remand suit number 9302137(96 CA 0381) and the reconventional demand from suit 9302674 to the district court for further proceedings. The costs of the appeal are assessed to plaintiffs.
AFFIRMED, and REMANDED.
NOTES
[1] The Honorable Ralph Tyson, Judge, 19th Judicial District Court, is serving as judge pro tempore by special designation of the Louisiana Supreme Court.
[2] Several other defendants were named. By the time of trial, the remaining defendants were First Guaranty Bank, Marshall Reynolds, Robert Beymer, Josh Cox, Margaret Alford, F. Fanancy Anzalone, Collins Bonicard, Mary Ann Cefalu, Andrew Gasaway, Jr., William Hood, Alton Lewis, Jr., J.S. Mashburn, Nicholas Saladino, and Michael Landry. The individual defendants were or are officers, directors, or investors in First Guaranty Bank.
[3] The Pangaea contract suit, number 9302674, was consolidated below with number 9302137. The latter suit number concerns a dispute between Jenson and the Bank, and its directors, over the benefits owed Jenson under his employment contract, upon termination. Incidental actions, a reconventional demand and a counter claim, were also filed in number 9302137. Both cases were consolidated for appeal as 96 CA 0382 and 0381, respectively. However, the issues raised in the employment contract suit and the incidental actions were not argued during the hearing on the motions for summary judgment, and were not discussed by the trial court in its reasons for judgment. The only judgments in the record are numbered 9302674. These judgments decide the issues raised in the principal Pangaea contract suit. The record contains no judgment in suit number 9302137 or in the reconventional demand filed in 9302674. For these reasons, we believe a remand to the district court of suit number 9302137(96 CA 0381) and the reconventional demand in 9302674 is necessary.
[4] Plaintiffs filed, in this court, a motion to remand for the taking of new evidence. The motion, and all ancillary motions, are denied. The alleged new evidence was either produced or could have been obtained by plaintiffs with due diligence. Disagreements over responsiveness and privilege could have been resolved by motions to compel. The items alleged to be newly discovered, attached to the motion, would not have changed the outcome. See Duncan v. State, Department of Transportation and Development, 615 So.2d 305, 312 (La.1993).
[5] The incorporators of Pangaea, Inc. were Rick Jenson, Scott Crabtree, and Michael Landry, all employees of the Bank. Mr. Landry later renounced all of his interest and any position he held in the corporation.